## CLAUSE, ADMINISTRATOR, ETC. v. COLUMBIA SAVINGS AND LOAN ASSOCIATION.

BUILDING AND LOAN ASSOCIATIONS—EFFECT OF AN ESTIMATE OF TIME REQUIRED TO MATURE SHARES—LOANS—CONTRACT OF BORROWING SHAREHOLDER—CONSTRUCTION—BURDEN OF PROOF AS TO MATURITY OF STOCK—STATUTE OF LIMITATIONS—NEW ACTION AFTER FAILURE OTHERWISE THAN ON THE MERITS—SUMMONS—SERVICE BY CORONER—JURISDICTION—PERIOD OF LIMITATION ON DEBT PAYABLE IN INSTALLMENTS—EFFECT OF OPTION TO DECLARE ENTIRE DEBT DUE AND PAYABLE UPON PARTIAL DEFAULT—ALLOWING CREDIT FOR BORROWER'S STOCK UPON DEBT TO BUILDING ASSOCIATION.

1. Where the by-laws of a mutual building and loan association provide that its stock is to be matured by the equal application to all of it, or all of a series, of the monthly dues and profits, and that it will mature whenever the amount to its credit shall equal its par value, a mere estimate of the time which will be required to mature the stock plainly stated as an estimate in the by-laws and printed circulars of the association, does not bind the association to mature its stock within the estimated period, or limit the period for the payment of dues.

2. The by-laws of a mutual building and loan association provided that its stock should mature whenever by the equal application thereto of the monthly dues and profits the amount to its credit should equal its par value, that shareholders not obtaining loans should pay monthly a stated sum on each share, and that borrowing shareholders should pay monthly "until the stock borrowed upon shall have matured and the loan is thereby repaid" one seventy-second of the sum borrowed (less the membership fee) also interest at the rate of three per cent per annum upon the original amount of the loan. *Held,* that the section relating to payments by borrowing shareholders is not to be construed as providing for liquidating the indebtedness with 72 monthly payments or for merely three per cent interest on the loan, but for a continuance of the required monthly payments until the maturity of the stock; that the interest to be paid for the use of the money advanced is that portion of the monthly payment in excess of the regular stock dues; and, therefore, that the obligation of a borrower under his contract to make the stated monthly payment

until the stock borrowed upon shall have matured and the loan is thereby repaid is not terminated upon making the payments for a period of 72 months, unless the stock has matured.

3. Where the issuance and service of a summons in an action is sufficient to confer jurisdiction over the person of the defendant the action will have been commenced, the proceeding being otherwise regular, although the service is afterwards quashed, within the meaning of the statute (Sec. 3465, R. S. 1899) providing that if in an action commenced in due time the plaintiff fail otherwise than upon the merits, and the time limited for the commencement of such action has at the date of such failure expired, the plaintiff may commence a new action within one year after such date.

4. To have the effect of failing to give jurisdiction a summons or the service thereof must be so radically defective that it would authorize a collateral impeachment of a judgment rendered thereon.

5. The coroner being authorized to serve process where the sheriff is a party to the action, the service by him of a summons will not render the judgment void and thus throw it open to collateral impeachment, although it may have been irregular and a ground for quashing service upon objection that the sheriff was improperly joined as a party defendant.

6. Where the service of summons by the coroner is quashed because the sheriff was improperly joined as a party defendant there is a failure by the plaintiff otherwise than upon the merits within the statute authorizing in such case where the action has been commenced in due time the commencement of a new action within one year after the date of such failure if at the date thereof the time limited for the commencement of such action has expired.

7. Where, through the quashing of the service of summons, there has been a failure by the plaintiff otherwise than upon the merits in an action commenced in due time, and at the date of such failure the time limited for the commencement of the action has expired, thus rendering applicable the statute authorizing the commencement of a new action within one year after the date of such failure, the plaintiff may cause the issuance and service of another summons in the same action upon the petition previously filed, or an amended petition, thereby commencing the action anew.

8. Where a debt is payable in installments the statute of limitations runs upon the whole debt from the date of the first default only when such default has the effect, by the terms of the contract or otherwise, of maturing the whole debt. If the default does not mature the whole debt, then the statute will run from the date thereof, if at all, only upon the installment as to which the default has occurred.

9. Under a provision in a trust deed or mortgage securing a debt payable in installments that upon any default the whole debt and interest may at once, at the option of the legal holder thereof, become due and payable, the option is solely for the creditor's benefit, and unless he exercises it, the statute of limitations runs on the debt only from the time of its maturity as originally fixed.

10. It was provided in the by-laws of a mutual building and loan association that if any shareholder shall neglect to pay interest or dues on his loan, or the regular monthly installment, or other fees, for six months, the association may compel payment of principal, interest, fees, or dues by proceedings on his note, and foreclosing the mortgage or other security, which shall at once become due and payable. *Held,* that whether or not the provision matures the debt absolutely without an option at the time it takes effect, it is not to be construed as doing so until after a failure for six months to make the required payments.

11. A shareholder of a mutual building and loan association, upon receiving a loan equal to the par value of his shares, executed a note or contract acknowledging the loan and providing for the monthly payment of a stated sum "until the stock borrowed upon shall have matured in accordance with the by-laws and rules of said association, and this loan is thereby repaid," and made the required payments for six years, a period originally estimated in the by-laws and circulars of the association to be sufficient to mature the stock. No further payments being made, the association several years later sued to recover a . sum alleged to be due upon the note. *Held,* that the plaintiff to maintain its right of recovery was bound to prove that the stock had not matured, since otherwise no default could be established.

12. The plaintiff association having alleged in its petition · in such suit the value of the stock at the time of bringing suit and a willingness to credit the value upon the amount found to be due, and the answer, without objecting to

such credit, having denied that the value was only that stated in the petition, and alleged that the stock had or ought to have matured and therefore there was no indebtedness, the defendant shareholder should be allowed the value of the stock with interest in reduction of any amount found to be due upon the debt.

[Decided April 21, 1908.]                    (95 Pac., 54.)

ERROR to the District Court, Carbon County; HON. DAVID H. CRAIG, Judge.

The facts are stated in the opinion.

*McMicken & Blydenburgh,* for plaintiff in error.

It was necessary for the plaintiff to prove the stock had not matured to maintain its suit. The failure to pay an installment, if any was due, in view of the by-laws of the association, gave a right of action upon the whole debt, and, therefore, upon the first default the statute of limitations commenced to run. (Bank v. Peck, 8 Kan. 663; Hemp v. Garland, 4 Q. B. 519; Reeves v. Butcher, 2 id. 509; Mach. Works v. Reigon, 64 Tex. 89; Noell v. Gaines, 68 Mo. 649; Mfg. Co. v. Howard, 28 Fed. 741; Darrow v. Scullin, 19 Kan. 59; Meyer v. Grauber, id. 165; Lewis v. Lewis, 58 id. 564; Douthitt v. Farrell, 60 id. 195; Kennedy v. Gobson, 68 id. 612.) The statute runs against building associations as in case of other corporations. (Thomp. B. Associations, (2d Ed.) 202.) The first summons and service that was quashed was void because improperly directed to and served by the coroner, and no action was therefore commenced by it, so that the statute authorizing a new action in one year did not become applicable. The action was barred under both the general statute and the section relating to suits against an administrator. When a summons is void and not voidable. (Bowen v. Jones, 13 Ired. L.; Anthony v. Beede, 17 Ark. 447; Rudd v. Thompson, 22 Ark. 363; Vaugh v. Burn, 9 Ark. 20; Bertonlin v. Bourgoin, 19 La. An. 360; Bigboo v. Ashley, 7 Ill. 151; Hickey v. Fonistal, 49 Ill. 255; Arnold v.

Winn, 26 Miss. 338; Nabors v. Thorson, 1 Ala. 590; Cull-anry v. Hanold, 61 Ga. 111; Smith et al. v. Anrick et al., 6 Colo. 338; Sidwell v. Schumaker, 99 Ill. 426; Hocklander v. Hocklander, 73 Ill. 618; Tyman v. Hilton, 44 Cal. 630; Ward v. Ward, 59 Cal. 139; Johnson v. Turnell, (Wis.) 89 N. W. 515; Flint v. Noyes, 27 Kan. 331; Coke Litt. 168 a.; Graves v. Smart, 75 Me. 295; Galvey v. Jones, 80 Ga. 136; Gowley v. Sanders, 88 Ky. 346; Williams v. Hutchin-son, 26 Fla. 513; Jonasen v. Walthers, 26 Fla. 448; Andrews v. Fitzpatrick, 16 S. E. 278; Biard v. Smith, 9 Ia. 50; Car-lisle v. Weston, 21 Pick.; Granties v. Rosecrance, 27 Wis. 488; R. Co. v. Sayre, 13 N. W. 404; Gallegee v. Pino, 1 N. H. 410; Wood v. Crosby, 2 Hi. 520; Avery v. Warren, 12 Heisk. (Tenn.) 569.)

A suit instituted and voluntarily abandoned is not avail-able in a subsequent action to save it from the statute. (Neil v. Canal Co., 4 Ind. 431; Ivans v. Schooley, 18 N. J. L. 269; Reilly v. Reilly, 64 Hun 496; Seigfried v. R. R. Co., 50 O. St. 294.) Unless there has been service within 60 days, no matter how the failure to obtain legal service oc-curred, even if it was by the action of the defendant in pur-posely avoiding service, the statute will bar the action if not in time. (Maghee v. Gainsville, 78 Ga. 790; Amy v. Watertown, (U. S.) 32 L. Ed. 953; Knowlton v. Water-town, 130 U. S. 327; Burgett v. Strickland, 32 Hun 264.) Where the service is defective, the statutes are not sus-pended. (Furkeks v. Case, 75 Ia. 152; 39 N. W. 238; Peck v. Ins. Co., 102 Mich. 52; Woodville v. Harrison, 3 Wis. 360; Johnson v. Turnell, 113 Wis. 468.)

The action here was not commenced. (Davis v. Ballard, 38 Neb. 830; Trust Co. v. Atherton, 67 Neb. 305; Burling-ton v. Cooper, 53 N. W. 1025; Hotchkiss v. Aukerman, 65 Neb. 177; Searle v. Adams, 89 Am. Dec. 298; Smith v. Day, (Ore.) 64 Pac. 812; Bacigalapo v. Court, 40 Pac. 1055.) The quashing of service left the case in the same condition as though no summons had ever issued, except that it might perhaps have been claimed to authorize a

service within sixty days as an attempted commencement of the action. (Supply Co. v. Freeze, 74 S. W. 303; Hayton v. Beason, 31 Wash. 317; Bertrand v. Knox, 39 La. An. 431; Detroit, &c. Co. v. Bagg, 44 N. W. 149; Blair v. Cary, 9 Wis. 543; Wolfenden v. Barry, 65 Ia. 653; Neick v. Leigh, 59 Hun 616; Fulbright v. Tritt, 19 N. C. 491; Hanna v. Ingram, 53 N. C. 55; Wilton v. Detroit, 100 N. W. 1020.)

The summons of Dec. 7, 1901, was so materially different as to its endorsement, that although styled an "alias" it could not relate back to the time of the original to stop the running of the statute. (Elman v. R. R. Co., (Neb.) 105 N. W. 987; R. R. Co. v. Nichols, 8 Colo. 188; Smith v. Aurnich, 6 id. 388; Watson v. Cartner, 1 Neb. 131.) That summons was the actual commencement of the action, and at the date thereof the statutes had run.

*Jabez Norman,* for defendant in error.

Upon the facts five years had not elapsed from the date of the first default, which was on the last payment due the last Saturday in July, 1896. If that was not the case, the statute would not apply to this note, as there was no definite time for its maturity; the payments thereon were to continue until the stock had matured; and to mature this stock sufficient payments and profits must be made to make each share worth one hundred dollars, and the payments and profits did not amount to that sum.

The option provision of the trust deed takes the case out of the statute, for the entire debt was to become due only at the declared option of the holder. (Lowenstein v. Phelan, 17 Neb. 429; Leavitt v. Reynolds, 79 Ia. 348; Watts v. Creighton, 85 Ia. 154; Mfg. Co. v. Howard, 28 Fed. 741; Bank v. Neb. &c. Co, 17 Fed. 763; Belloc v. Davis, 38 Cal. 242.) The suit was commenced with the filing of the original petition and issuance of the summons. (Ry. Co. v. Shelton, 57 Ark. 459; Cox v. Strickland, 120 Ga. 109; Titus v. Poole, 40 N. E. 228 (N. Y.) The section authorizing a new action in one year after a failure otherwise than

on the merits became applicable upon the quashing of service. (Conolly v. Hyams, 68 N. E. 662; Meiss v. McCoy, 17 O. St. 225; Ry. Co. v. Bemis, 64 O. St. 26.) The contract of the shareholder was not limited to 72 monthly payments. (Asso'n. v. Lyttle, 16 Colo. App. 423; Asso'n. v. Jungquist, 111 Fed. 645; Kinney v. Asso'n., 113 Fed. 364.)

POTTER, CHIEF JUSTICE.

The defendant in error, who was the plaintiff below, is a Colorado corporation and belongs to that class of private corporations commonly known as building associations. Its original corporate name was The Columbia Building and Loan Association. In 1899 the name was changed to The Columbia Savings and Loan Association. This suit was brought by the association to recover an amount alleged to be due upon the note or contract of a borrowing shareholder.

Robert O'Malia, then a resident of the City of Rawlins, in this State, became a member of said association June 4, 1890, and received a certificate of that date entitling him to ten shares of the capital stock, subject to the conditions, rules, regulations and by-laws of the association. The by-laws required of each shareholder a monthly payment on the last Saturday of each month of seventy cents on each share, where no loan had been obtained on the stock, but in the event of such loan the payments were regulated by another provision presently to be referred to. It was also stated in the by-laws that each shareholder should be entitled to receive for each share named in his cetrificate one hundred dollars when the monthly payments and the profits apportioned thereto should equal that sum. Also that a shareholder was entitled to a loan from the association of an amount equal to the value of his shares at maturity, upon making a proper application therefor, and giving the required security. While holding said ten shares, and having regularly made the monthly payments thereon, O'Malia applied for, and, on May 26, 1893, received, a loan of one

thousand dollars, which sum equaled the amount to which he would be entitled, in the absence of a loan, upon the maturity of his shares. With his wife he executed a note or contract for the repayment of the loan and a trust deed covering real estate in Carbon County, this state, to secure it, and as collateral security he assigned to the association his shares of stock. Omitting the signatures the note or contract reads as follows:

"No. 500. $1,000.

"Rawlins, Wyoming, May 26, 1893.

"In consideration of One Thousand ($1,000) Dollars loaned to me by the Columbia Building and Loan Association, we or either of us hereby promise to pay said Association at its office in Denver, Colorado, Sixteen and 25-100 Dollars per month, payable on the last Saturday of each and every month until the stock borrowed upon shall have matured in accordance with the by-laws and rules of said association and this loan is thereby repaid. The shares of stock in the Columbia Building and Loan Association held by the maker of this note as shown by Certificate of Stock No. 1753 are hereby transferred and pledged to the said association as collateral security for the performance of the conditions of this obligation and of the trust deed securing same."

The trust deed provided that in case of default in any of the payments of principal or interest, according to the tenor and effect of "said promissory note" the whole of said principal sum secured and the interest thereon to the time of sale, may at once, "at the option of the legal holder thereof, become due and payable," and the premises sold as if the indebtedness had matured. Payments by borrowing shareholders were to be governed by the following provision of the by-laws:

"Shareholders having obtained loans shall, on or before the last Saturday of each and every month until the stock borrowed upon shall have matured and the loan is thereby repaid make or cause to be made payments as follows: One

seventy-second of the sum borrowed (less the membership fee), also interest at the rate of 3 per cent per annum upon the original amount of the loan."

During the period intervening between the date of his membership and the time when he received the loan, O'Malia regularly paid the required monthly payment of seven dollars dues on his stock, and, after receiving the loan, he regularly paid the monthly installment required by the note or contract until and including the motnh of May, 1896, making in the aggregate seventy-two monthly payments. There is some dispute as to whether his last payment was for the month of May or June, 1896, but we think it reasonably clear from ·the evidence that it was the payment due the last Saturday in May. It was entered in his pass book as paid May 30, though it was not credited on· the association's books· until some time in June. No further payments were made. O'Malia died September 2, 1900, and shortly thereafter James H. Clause was appointed administrator of his estate. The association presented to the administrator its claim here sued upon, and the same was rejected April 13, 1901. The trust deed given to secure the loan aforesaid was made to Clyde J. Eastman, as trustee, and provided that in case of the latter's death, resignation, removal or absence, or failure or inability to act, the sheriff of Carbon County should become his sucecssor in trust.

On July 2, 1901, the association as plaintiff filed a petition for the commencement of a cause in the District Court of Carbon County, naming James H. Clause, as administrator of the O'Malia estate, and Creed McDaniel, the sheriff of Carbon County, as defendants. The facts deemed necessary to a recovery upon the claim of the association were set out, and it was also alleged that the trustee named in the trust deed had resigned, and that the sheriff therein appointed as his successor in trust had declined to accept the trust. The prayer of the petition was for judgment against the administrator for the amount alleged to be due, viz: $680.70, with legal interest from May 27, 1901, and

for a sale of the property covered by the trust deed. On the same date (July 2, 1901) a summons was issued on the petition against the defendants therein named by the clerk of the court, under the seal thereof, directed to the coroner of the county. The coroner's return showed service upon Clause, the administrator, July 3, 1901. The latter, appearing specially for that purpose, filed a motion to quash the service and summons on the ground that though the sheriff was named as a defendant, it appeared from the allegations of the petition that he was neither a proper party nor interested in the action, and that the process had been improperly directed to and served by the coroner. Upon that motion the district court, by an order entered November 8, 1901, quashed the service, and continued the cause for service. An alias summons was issued on the date last mentioned directed to the sheriff naming the administrator as the only party to be served. That summons appears to have been duly served upon the defendant administrator on the day it was issued. On December 7, 1901, the answer day under the summons of November 8, an amended petition was filed, and a summons issued thereon. The amended petition omitted the sheriff as a party and the prayer for a sale of the property, and demanded judgment for the allowance of the plaintiff's claim to be paid by the administrator out of the proceeds of the estate. On behalf of the administrator a demurrer was filed to that petition, which does not appear to have been acted on.

A second amended petition was filed June 26, 1902, and a summons was issued thereon June 27, 1902. The summons was duly served, and the defendant administrator filed a demurrer, which was sustained, and judgment was rendered thereon against the association. That judgment was reversed by this court on error, and the cause remanded with directions to overrule the demurrer, and for further proceedings. (13 Wyo. 166.) Upon the return of the cause to the district court, an answer was filed to the second amended petition, and the plaintiff filed a reply.

Upon the issues thus joined a trial was had to the court without a jury, resulting in a judgment for the plaintiff association for the sum of $2,053.10, made up as follows: Principal, $1,000. Interest to the date of judgment, November 27, 1905, $1,053.10. The judgment ordered this amount to be paid by the administrator in due course of administration. A motion for new trial was filed and overruled, and the administrator brings the case here on error.

The original and each amended petition alleged that the shares of stock held by the decedent had not matured, and that their value June 27, 1901, a few days prior to filing the first petition, was $887.85. Each petition alleged a total indebtedness due May 27, 1901, of $1,568.55, consisting of $1,000 principal, $553.15 interest from June 3, 1896, to May 27, 1901, and $15.40 insurance charges paid by the association with interest. The original, as well as the first amended, petition credited the alleged value of the stock, and asked judgment for the balance, $680.70, with interest thereon from May 27, 1901. The second amended petition alleged a readiness to credit the stock value, but, without deducting it, claimed judgment for the total indebtedness aforesaid, with interest from the date mentioned. The insurance charges were not allowed, and need not therefore be considered. It appears that the interest included in the alleged indebtedness was computed at the rate of $9.25 per month, and that the interest embraced in the judgment was computed at the same monthly rate to the date of judgment. This was upon the theory that the agreed monthly installment of $16.25 included the monthly stock dues of seven dollars, leaving the balance as interest. The evidence shows that the installments paid were each so credited upon the books of the association, $7 to dues and $9.25 to interest, and the first two payments made by the decedent under the loan contract were entered in his pass book in two separate items of $9.25 and $7, and in entering therein the three succeeding payments the figures $9.25 were entered in the column headed "Interest and dues" and $16.25 in the column

headed "Totals." There was no showing upon the trial by either party as to whether or not the stock borrowed upon had matured, or what its value was at the time of trial or at any other time.

1. The defendant by his answer alleged and it is here contended that upon the by-laws of the association, and the representations of its agents and printed circulars, the obligation of the decedent as a shareholder was to pay seventy cents monthly on each share for a period of seventy-two months, and that the contract for the repayment of the loan obligated him only to make the agreed monthly payments the remainder of the period of seventy-two months, and thereby cancel the indebtedness. This position cannot be sustained.

It is true that a printed circular or prospectus distributed by the association explaining its methods and purposes stated that "shares are estimated to mature in six years, and the member may then withdraw such shares and receive $100 therefor." But that was immediately preceded by the statement: "Whenever the amount in the loan fund to the credit of any share (from monthly payments and profits) is equal to $100 such share shall be fully paid in and be considered to have fully matured and no more monthly payments shall be required." And it was followed by a statement that the six year estimate as to maturity of stock is a conservative one based upon the experience and calculations of the larger English associations of a similar character. It is also true that the by-laws contained a like estimate of the period required to mature the shares, and stated that all loans and calculations are made upon that estimate; and the illustrations furnished by the association as to the cost to shareholders, both borrowing and non-borrowing, were based upon seventy-two monthly payments. The by-laws however plainly provided that each shareholder would be entitled to receive $100 for each share *when the monthly payments and profits apportioned thereto should equal that sum.* There is testimony also to the effect that at

a meeting of prospective shareholders at Rawlins, where the decedent resided, an agent of the association stated that monthly payments for seventy-two months would mature the stock. The construction contended for is claimed also to be the effect of that provision of the by-laws regulating the payments by borrowing shareholders, which fixes the monthly installment at one-seventy-second of the amount of the loan (less the membership fee) with three per cent interest per annum added. The printed circular and the by-laws stated that the association was purely mutual and co-operative, and that each member was interested in all the assets in proportion to the stock held by him.

It is apparent that the controlling provision as to the maturity of the stock, both in the circular and by-laws, is that which states that the stock will mature whenever the amount to its credit shall equal its par value. Upon that basis it would be manifestly impossible to arbitrarily determine in advance the date of maturity. Though the period required to mature the stock might be estimated, it could not be definitely fixed without ignoring the essential features of the association, and the plan adopted for maturing its stock. Six years was not stated as an arbitrary or fixed period for the stock to run, or for limiting payments, but it was expressly stated to be an estimate. It is clear that the impossibility of stating a definite time otherwise than as an estimate or opinion was recognized by the officers of the association, since they did nothing more in that respect than to state an estimated period. Such an estimate, plainly stated to be such, is not to be distorted into a contract or promise to mature the shares within the estimated period.

Where a mutual building and loan association provides for maturing its stock by the equal application to all of it, or all of a series, of the monthly dues and profits, as in the case of the association here, the argument that the association is bound by an estimate as to time of maturity, so as to limit the period for payment of dues, has not usually, if ever, been regarded with favor by the courts. That the cir-

culars and by-laws of the association here did not require or provide for the maturing of the stock in the estimated period has been uniformly held where they have been considered. (Columbia, &c. Asso'n. v. Jungquist, 111 Fed. 645; Kinney v. Columbia, &c. Asso'n., 113 Fed. 359; Columbia, &c. Asso'n. v. Lyttle, 16 Colo. App. 423.) Indeed it was held in Colorado, where the association is incorporated, that it had no power to contract that stock would mature at a fixed time. (Columbia, &c. Asso'n. v. Lyttle, *supra.*) In that case it was said with reference to the question here presented: "From this circular it appears that the shareholders of appellant united in a business venture for their mutual benefit, all shareholders to profit, or lose, in proportion to their respective shares of stock, their respective interests at any time in the association being in proportion to their stock; the value of their stock depending upon the financial success of the corporation; the further value of the stock being uncertain because dependent upon unknown factors that might enter into the future operations of the corporation. This circular stated facts from which it appeared that no one could state when the stock would mature; an effort to do so could not be other than an estimate."

The rule laid down in the by-laws for determining the monthly payments required of borrowing members seems to be unnecessarily complicated. It is difficult to understand why the stated method was employed except upon the theory that it was not desired to designate as interest the amount to be paid for the use of the money advanced. The section is not, however, open to the construction that it provides for liquidating the indebtedness with seventy-two monthly payments, nor that it provides for interest upon the loan merely at the rate of three per cent per annum. The section itself states that the monthly payments thereby provided for shall be continued until the stock borrowed upon shall have matured, and it must moreover be construed with the other provisions, particularly that one which requires shareholders to pay each month seventy cents on each share, unless a loan

has been obtained, and the one providing for maturing the stock by apportioning thereto the monthly payments and profits. However confusing in the abstract the provision for the monthly payments of borrowing shareholders may be, it does not seem possible that a shareholder could understand that his liability for stock dues would cease upon receiving a loan, and that thereafter he would be engaged in merely repaying the principal of the loan in monthly installments, with three per cent interest. There is clearly no foundation for such a belief upon any reasonable or proper construction of the by-laws, or the contract here in suit. The shareholder continues such after as well as before receiving a loan, and thereafter he sustains the dual relation to the association of shareholder and borrower, with the rights and obligations of each. The monthly payment required of the borrowing shareholder necessarily includes the monthly stock dues, for the shares remain in existence, and are to be matured by the application of monthly payments and profits, the same as shares not borrowed upon, and upon their maturity the loan is to be cancelled. The balance of the required monthly payment in excess of the dues can only represent the amount paid for the use of the money advanced prior to the maturity of the stock, and therefore constitutes the interest to be paid. In this case such interest amounted to $9.25 per month. It would seem that this must have been understood by the shareholder in this case, since the earlier payments under the loan contract were entered in his pass book in separate items of $7 and $9.25; the former sum being the amount that he had previously paid monthly as dues upon his shares. We perceive no ground, therefore, for holding that the contract entered into was different from that expressed upon its face, viz: to pay the required monthly installment "until the stock borrowed upon shall have matured in accordance with the by-laws and rules of said association."

2. The defendant pleaded in separate defenses both the general statute of limitations as to an action upon a contract

in writing, and the special statute as to an action upon a claim against the estate of a decedent rejected by the executor or administrator. An action upon a contract or promise in writing is limited generally to five years after the cause of action has accrued. (Rev. Stat. 1899, Secs. 3453, 3454.) Suit upon a claim against the estate of a deceased person, which has been rejected by the excutor or administrator, is required to be brought within three months after the date of its rejection, if then due, or within two months after it becomes due. (Id. Sec. 4753.) It is here contended that the evidence shows the action to have been barred under each statute, and that the judgment should be reversed on that ground.

The theory of the contention as to the general statute is, first, that the cause of action accrued upon the occurring of the first default, the last Saturday of June, 1896, and second, that if, as the plaintiff claimed, the first default occurred in the payment due the last Saturday of July, 1896, then the action was not commenced within five years thereafter for the reason that the service of the summons issued upon the petition filed July 2, 1901, having been quashed, because improperly directed to and served by the coroner instead of the sheriff, the summons and service thereof was not sufficient for the commencement of the action, within the meaning of the statute as applied to the limitation of actions. Upon the ground that the summons aforesaid was void and its service quashed, it is contended that the action cannot be deemed to have been commenced with its issuance, and therefore, that it was not commenced within three months after the rejection of the claim by the administrator, which occurred April 13, 1901; and that under the special statute the suit was barred before a valid summons was issued. With reference to the point made as to the summons and the quashing of the service thereof, the defendant in error relies to save the bar of the statute upon the provisions of Section 3465, Revised Statutes of 1899, which reads as follows:

"If in an action commenced in due time, a judgment for the plaintiff be reversed, or if the plaintiff fail otherwise than upon the merits, and the time limited for the commencement of such action has at the date of such reversal or failure expired, the plaintiff, or if he die and the cause of action survive, his representatives may commence a new action within one year after such date, and this provision shall apply to any claim asserted in any pleading by a defendant."

The question raised upon the defective service will be first considered. The first summons was ordered quashed November 8, 1901, and an alias issued on that date and duly served. Another summons was issued upon the amended petition December 7, 1901, and duly served; and summons was again issued June 27, 1902, upon the second amended petition, and it was duly served. Each new summons was issued within the year after the date of quashing the first. The question therefore is in this connection whether the filing of the petition and issuance of the summons of July 2, 1901, which was afterwards quashed, operated to commence the action, so as to render applicable the statutory provision above quoted, assuming that the general statute had not barred the action at the date last aforesaid.

Within the meaning of the limitation statutes it is declared that "an action shall be deemed commenced  *  *  *  * as to each defendant, at the date of the summons which is served upon him, or on a co-defendant who is a joint contractor, or otherwise united in interest with him; and when service by publication is proper, the action shall be deemed commenced at the date of the first publication, if the publication be regularly made." (R. S. 1899. Sec. 3461.) And that "an attempt to commence an action shall be deemed equivalent to the commencement thereof  *  *  *  * when the party diligently endeavors to procure a service; but such attempt must be followed by service within sixty days." (Id. Sec. 3462). A civil action

is commenced by filing in the office of the clerk of the proper court, a petition, and causing a summons to be issued thereon. (Id. Sec. 3507). The summons is required generally to be directed to and served by the sheriff. (Id. Secs. 3509, 3513). When, however, the sheriff is a party to the case, the duty of serving and executing process devolves upon the coroner. (Id. Sec. 1172). Though the sheriff was named in the petition as a party defendant, the court, in quashing service upon the motion therefor, must have decided that he was not a party within the meaning of the statute authorizing service of process by the coroner, and that the service by the coroner was improper. The correctness of that decision must be here assumed. Was there then, within the meaning of section 3465, a failure by the plaintiff otherwise than upon the merits, in an action commenced in due time, so as to authorize bringing a new action within one year after the date of such failure? In our opinion this question must be answered in the affirmative, assuming as to this point that the general statute had not run at the time the petition was filed and the summons issued, and that the time limited for the action expired between its commencement, July 2, 1901, and the quashing of service.

The question is not affected, in our opinion, by section 3462, making an attempt to commence an action followed by service within sixty days equivalent to the commencement thereof, for here service was obtained upon the summons issued, and if the action was not commenced by the issuance and service of that summons, Section 3465 would not apply, and there would be no extension of the statutory period. But if the action was commenced, then section 3465 applies if there was a failure by the plaintiff otherwise than upon the merits. The court had unquestioned jurisdiction of the subject matter of the action, so that if the service of the summons by the coroner conferred jurisdiction over the person of the defendant, the action must be held to have been commenced. The mere fact that the service was quashed

does not determine the question, for it is not every irregularity or imperfection in a summons or the service thereof which will deprive the court of jurisdiction, though it may justify or require the setting aside of service upon motion, or the reversal of a judgment upon a proper application. To have the effect of failing to give jurisdiction, the summons or service must be so radically defective that it would authorize a collateral impeachment of a judgment rendered thereon—that is to say, it must be void and not merely voidable.    (23 Cyc. 1075, 1076.)

The decisions are not harmonious as to the particular defects in a summons which will render it void and permit on that ground a collateral attack upon the judgment. Various defects have been considered in that respect, and as to most of them a conflict of authority exists. There is some conflict, but not much where the process has been misdirected.    (Alderson on Judicial Wr. & Proc. ch. 6). Where there has been actual personal service, and therefore notice of the action, the weight of authority and the better reasoning favors the theory that a mistake in the direction or address renders the process voidable, but not void.  In the work above cited Mr. Alderson says, in summing up the matter:  "The progressive and equitable idea is, that in the administration of justice, substance is to be held in higher regard than form, and technical defects should never be permitted to work injustice or deny substantial right. Process that is in every other particular valid, should not, for any omission of or defect in the direction, be considered more than voidable."    (Id. Sec. 25.)

A practice had grown up in Massachusetts of having the writ directed to and served by a coroner whenever the sheriff was a member of a corporation, which was either plaintiff or defendant.  Finally that practice was held to be and to have been improper, but it was also held that the defect would not invalidate the judgments in cases wherein the incorrect practice had been followed.  The court said: "It is not too late to go back to the true construction, and

for the practice, if wrong, to be corrected. No decided cases can be disturbed, for it is only at the threshold that a wrong service by a sheriff or a coroner can be taken advantage of against the action." (Merchant's Bank v. Cook, 4 Pick. 405.) In Shaw v. Baldwin, 33 Vt. 447, it was held that though the service of process upon a sheriff by his deputy was irregular, if advantage of the defect was not taken by proper objection, the service was so far sufficient that a judgment could not be impeached if recovered on the process thus served. See also Simcoke v. Frederick, 1 Ind. 54; Burke v. Interstate &c. Asso'n. (Mont.) 64 Pac. 879. It is to be remembered that when the sheriff is a party to the case the coroner is required to serve process and perform all other duties of the sheriff. In this case as originally brought the sheriff was named as a party defendant. Had no question been raised as to parties his name might have been retained as a party to the case. To determine the insufficiency of the summons and service it was necessary that the court look into the petition and the allegations thereof to ascertain and adjudge whether or not he had been properly named as a defendant. Had the plaintiff in error here, who had been joined with the sheriff as a defendant, not objected, we do not think that upon collateral attack, the judgment could have been held void on the ground of defective process because the sheriff had been improperly made a party. The coroner being an officer authorized under certain circumstances to serve process, we are satisfied that service by him, though improper, and furnishing a reason for quashing service upon objection, or for reversal of the judgment, in case of the erroneous overruling of such an objection, does not have the effect of rendering the judgment absolutely void, or throwing it open to collateral impeachment, where, at least, the sheriff appears to have been named as a party to the cause.

The summons and service not having been void, but voidable only, the action was commenced within the meaning of section 3465. Upon the quashing of the service there

was a failure otherwise than upon the merits, thus render-
ing Section 3465 applicable. (Meisse v. McCoy's Admr. 17
O. St. 225; Ketterman v. Railroad Co., 48 W. Va. 606;
Isaacs et al v. Price, 2 Dill. 347; Eaton v. Chapin, 7 R. I.
408; Bank of Topeka v. Clark, (Kan.) 77 Pac. 92; Harris
v. Davenport, 132 N. C. 697.) The case cited in 4 Dillon
construed a similar statute of Kansas. There had been a
defective service and a judgment had been set aside on
that ground. Judge Dillon held that the judgment upon
the first service was not void, but regular upon the record,
that there had not been a failure on the merits, but the
plaintiffs were within the equitable and just provision of the
legislation made for such cases, referring to a section of
the statute identical almost with our section 3465. In the
West Virginia case above cited, the failure because of de-
fective summons was said to be within the very reason of a
similar statute extending the time after a dismissal for any
cause which could not be plead in bar of the action.
Statutes of this character are usually construed very liberal-
ly. Indeed, there are a number of cases holding that a dis-
missal for want of jurisdiction is such a failure otherwise
than on the merits as is contemplated by the statute extend-
ing the period of limitation for a new action.

If, nothwithstanding that the time limited had expired
at the time of the failure through the quashing of service,
a new action might have been brought within one year
thereafter, there seems no good reason for doubting the
right of the plaintiff to cause the issuance and service of
another summons in the same action, upon the petition prev-
iously filed or an amended petition, thereby commencing the
action anew. It is equivalent to commencing a new action
within the meaning of the statute authorizing it. Such ac-
tion is indeed then to be deemed commenced under section
3461 at the date of the summons served upon the defendant,
but the limitation period will have been extended one year
from the date of the previous failure by the operation of
section 3465.

This brings us to a consideration of the question whether under the general statute of five years, the commencement of the action July 2, 1901, was in due time. The contention that it was not is based on the theory that the cause of action accrued upon the first default—the last Saturday of June, 1896. Conceding that to have been the date of the first default the contention cannot be sustained. Where a debt is payable in-installments, the statute of limitations runs upon the whole debt from the date of the first default only when such default has the effect, by the terms of the contract or otherwise, of maturing the whole debt. If the default does not mature the whole debt, then the statute will run from the date thereof if at all only upon the installment as to which default has occurred. If this contract is to be construed as one providing for the payment of the debt by monthly installments, then the statute would have run merely upon the installment due in June 1896, at the time the action was commenced, unless that default matured the entire debt. As the interest part only of the agreed installment is sought to be recovered, there may be some question whether it would come under the rule as to debts payable in installments. But we think it clear that the default in the June, 1896, installment did not mature the whole debt at the date of such default, or at a date five years prior to the commencement of the action.

The provision of the trust deed as to maturing the debt upon default in making the agreed monthly payments is, that in case of such default "the whole of said prnicipal sum hereby secured and the interest thereon to the time of sale, may at once, at the option of the legal holder thereof (the note) become due and payable, and the said premises be sold in the manner and with the same effect as if the said indebtedness had matured." It does not appear that the option thus permitted of making the whole debt due and payable was exercised until the bringing of the suit. The contract did not declare that any default would at all events render the principal debt due at once, but only that

it might become due at the creditor's option. There is a conflict of authority upon the question whether, to set the statute of limitations in motion, a debtor can take advantage of a provision in the contract providing, without leaving it to the option of either party, that upon a failure to pay an installment the entire principal and interest shall become due and payable. (25 Cyc. 1103, 1104.) And there may be a few cases holding, where the provision is that the creditor may at his option hasten the maturity of the debt upon a default in the payment of interest or an installment, that the debtor may require the period of limitations to be computed from the default which would authorize the creditor to act. The better doctrine, however, is said to be, and we think correctly, that the option is solely for the creditor's benefit, and unless he exercises it the statute runs on the debt only from the time of its maturity as originally fixed. (19 Am. & Eng. Ency. L. (2nd Ed.) 205; Watts v. Creighton, 85 Ia. 154; Moline Plow Co. v. Webb, 141 U. S. 616.)

There is another provision entering into the contract here which seems to contemplate that a default in a single installment shall not immediately mature the debt. It is found in the by-laws of the association, and declares that "if any shareholder or other person shall neglect to pay the interest, or dues on his loan, or the regular monthly installments, or other fees, for six months, the association may compel payment of principal, interest, fees or dues, by proceedings on his note and foreclosing the mortgage or other security, which shall at once become due and payable." Whether or not this provision matures the debt absolutely without an option at the time it takes effect, it is not to be construed as doing so until after a failure for six months to make the required payments. Our attention has not been called to any other stipulation or provision affecting this question. The note or contract states no definite time for the payment of the principal of the loan, except that it requires the monthly payments to be made until the stock

shall have matured, whereupon the debt will become paid. If the whole debt became due and payable by virtue of the above mentioned provision of the by-laws upon default for six months in making the agreed payments, that time did not expire until the last Saturday of December, 1896, and within five years thereafter, viz: December 7, 1901, the amended petition was filed, and a summons issued thereon of the same date, which was served upon the defendant. We perceive no reasonable ground, therefore, for holding that the statute had run when the action was commenced.

3.    Nothwithstanding that there was no showing by the plaintiff, or indeed by either party, as to the value of the shares borrowed upon, or whether or not they had at any time matured, the plaintiff was permitted to recover the principal amount loaned and the agreed monthly interest thereon to the date of judgment.    This we think was erroneous.

The note or contract sued upon stipulates that, in consideration of the loan, the stated monthly installments shall be paid "until the stock borrowed upon shall have matured in accordance with the by-laws and rules of said association and this loan is thereby repaid." The agreement is not to pay the amount of the principal within a certain period, subject to a proviso or condition that the debt shall be deemed satisfied or cancelled whenever the stock shall mature, as in most of the reported building association cases which have come to our notice. The note here sued on had not become due upon its face because of the expiration of a definite time for which it had been given, but it became due and enforceable, if at all, because the monthly payments had not been continued as agreed until the maturity of the stock. The petition alleges that the value of the stock in June, 1901 had reached the sum of $887.85, only $112.15 less than its value at maturity. The cause was not tried until more than four years later. Continuous payments had been made previous to default for six years, a period originally estimated by the association to be sufficient

to mature the stock. There is no room, therefore, for the presumption in support of plaintiff's case that the debt had not been paid by the maturing of the stock in June, 1896, at the time of the alleged first default, or that when suit was brought or trial had, the stock had not matured so as to pay the principal and stop interest, at some intervening period. Nor, upon the circumstances, considering the length of the period between the making of the loan and the alleged default, and especially the time of bringing suit and the date of trial, can it be said that the production of the note or contract presented a *prima facie* case. It is true that an officer of the association, testifying as a witness, was allowed to state that there was due upon the note the principal sum of $1,000, and $1,053.10 interest, computed at $9.25 per month from June 3, 1896, to December 3, 1905. The amount of interest was a mere matter of computation, and the amount of the principal is expressed in the contract. Whether anything was or was not due or had become due depended upon the fact as to the maturity of the stock.

Had the note provided for a payment of the sum borrowed within a stated period, which had expired, that it had become due would then have been evident, and generally it would then have devolved upon the defendant to show payment or other facts relied upon to defeat a recovery. But upon the terms of the contract here, the case presents an exception to the general rule, and the plaintiff to maintain its right to recover was bound to prove a negative upon which its claim depended, viz: that the stock had not matured, for there could have been no default unless the negative was true, and hence no breach of the contract. Certainly the association would have no right to recover the principal if at any time it became paid by the maturing of the stock, nor interest after such payment occurred.

A similar question has been considered in two cases, though under different contracts and circumstances, but they illustrate the proposition. In Tyrrell L. & B. Asso'n. v. Haley, 139 Pa. St. 476, a bond had been given to a

building and loan association by a borrowing shareholder, conditioned for the payment of a loan within nine years from date, with interest, fines, etc., and a monthly contribution on the obligor's shares. In a suit upon the bond the defendant offered to show by a witness that the stock had matured upon the making of his last payment. The offer was refused on the ground that the matter could not be determined upon the judgment of a witness, but only by the division of the profits made by the officers of the association. It will be observed that the bond in that case fixed a definite period for the repayment of the loan, and in the decision of the case it seems to have been assumed that the burden of showing the maturity of the stock as a ground for discontinuing payments was upon the defendant, though the point really decided by the appellate court was that he had a right to prove the maturity of the stock in the manner proposed, in support of his equitable defense of payment. The court said:

"If the defendant is right in his contention, he certainly ought to have an opportunity of showing it, under his equitable plea of payment. As the case stands, he has a judgment at law against him for the full amount of the mortgage, which carries with it the costs of suit, while I see no relief from the effect of this judgment, except by a proceeding in equity, which involves additional expense and trouble. It would be unjust to subject him to all this, if, in point of fact, his series has matured. It is a well settled rule that when such stock has matured, the debt is paid, and the borrower is entitled to a return of his securities. There may be circumstances which prevent or delay the maturity of the stock in a given instance. This may result from fraud or mismanagement on the part of the officers of the association, or from loss on investments. *But, when the stock has fairly matured, I am unable to see what right the association has to recover a judgment against one of its stockholders for the amount of its loan.*"

In Concordia Sav. & Aid Asso'n. v. Read, 93 N. Y. 474, the action was to foreclose a mortgage given to secure a

bond conditioned to pay a certain sum in monthly install-
ments, together with fines, dues, &c., during the existence
of the association. It seems that the association would
cease whenever it had received money enough to redeem all
its outstanding shares. It was contended that it was incum-
bent on the plaintiff to show that there were outstanding
shares and the amount required to redeem them. The
principle so contended for was not denied, but it was held
that the proof was *prima facie* sufficient, for the reason that
the defendant had made payments less than a year after he
obtained the money, and the suit was begun within two
years after the loan was made, within which period enough
money to redeem the shares could not by any possibility
have been received by the association.

The facts here differ materially from those in the New
York case. Here the member had continued to pay through-
out the entire period originally estimated to be sufficient,
and though the association was not bound to mature the
stock within the estimated period, it is not unreasonable
to suppose that it made and published the estimate in good
faith, believing it to be conservative, and expecting the stock
to reach maturity within the time so stated. The plaintiff
alleged in each petition that the stock had not matured.
That allegation must have been regarded as material. We
think it was material. It is not apparent to us how a default
could be established except by showing that the stock had
not matured, for it is only until maturity that the payments
were agreed to be made. We are not now considering
whether the value of the stock should be credited to de-
fendant. The proposition goes to the foundation of plain-
tiff's case. In our opinion it was necessary for the plain-
tiff, not only to allege but to prove that the stock had
not matured, in order to establish a default under the con-
tract sued on, especially so as the facts are peculiarly with-
in the knowledge of the officers of the association. Not
only does the petition allege a value of the shares approach-
ing close to maturity, but it is stated in the brief of the as-

sociation filed in this court April 22, 1907, that the value had reached $1,258.58, a considerable sum in excess of the required value to mature the same. The same fact as to value was stated by counsel upon the argument of the case. It seems possible, if not indeed probable, from this statement, that interest may have been recovered at the monthly contract rate after maturity of the shares, and during a period when there would be no right to such interest. We are clearly of the opinion that whenever the stock reached maturity the principal was paid and interest thereafter ceased, though we assume that the unpaid interest for the period intervening between the time of default and maturity would be recoverable, if a default should be established.

As the case must be remanded for new trial, we think it proper to refer to the failure of the court to credit the value of the shares. While it is argued on behalf of the association that the application of the value of the stock in reduction of the indebtedness was not required in this action upon the note, it is, however, conceded that no court would enforce payment of the association's claim without compelling it to account for the value of the stock. It is not suggested how that accounting would be compelled. The judgment heretofore entered requires the administrator to pay the full amount of the claim, principal and interest, and necessarily leaves the stock or its value with the association. To get away from the necessity of paying the amount of the judgment, if allowed to stand in its present form, would seem to require, unless the association should voluntarily and satisfactorily account for the stock, an action of some sort by the administrator. In this connection the remark of the court in the Pennsylvania case above cited is pertinent. It would be unjust to require the defendant to pursue another remedy, perhaps expensive and troublesome, when the whole matter is capable of settlement in the one suit.

While the stock is technically held as collateral security, and the rules governing such securities are to a great ex-

tent applicable, it is to be observed that it differs in important particulars from ordinary commercial paper or stock in other corporations held as collateral. The stock here forms the basis of the loan, and upon its value depends the termination of the liability. The dues thereon were included in the monthly payment required by the loan contract. The expectation of the parties in such cases is to mature the stock, whereupon the relation both of shareholder and debtor will cease, so far as it is represented or affected by the stock borrowed upon. Although the payment of dues and interest will not *ipso facto* operate as payment upon the debt, the effect thereof, by assisting in the increase of the value of the stock, is to hasten the time of the satisfaction of the debt, and furnish the shareholder with an increasing fund to his credit which he may, under the rules of the association and the law governing it, have applied toward the reduction of his debt when called upon to pay it. We are aware that it is held that if neither party makes or asks for such an application, the law will not do so in the first instance, except perhaps upon final decree on foreclosure. Where, however, the member has been so long in default in the payment of dues as to show no disposition to continue the relation of shareholder, there seems to be no substantial reason against crediting the value of the stock and rendering judgment for the balance, if any. Such a course will close the litigation, and we see no injustice in it. It appears especially proper in this case against an administrator, the shareholder having died long after the alleged default.

Moreover, in the case at bar, the plaintiff alleges the value of the stock at a specified time, and a willingness to credit the value upon the amount found to be due. The answer does not object to such credit. It denies that the value is only the amount stated in the petition, and alleges that the stock had matured, or ought to have matured, and that by reason of its maturity, there was no indebtedness. Upon the pleadings, therefore, there is an admitted item of credit, and, without further proof, the value of the

stock was at least as great as admitted in the petition. We think it proper under the circumstances, if not indeed necessary, to allow the defendant administrator the value of the stock with interest in reduction of any amount found due upon the debt, if a debt should be established. A credit having been admitted by the plaintiff in its petition, proof thereof on the part of defendant was not required, except to establish a credit for a greater amount.

For the insufficiency of the evidence to show that the stock borrowed upon had not matured at the time of the alleged default, and when, if ever it did mature, the judgment will be reversed, and the cause remanded for new trial.

BEARD, J., and SCOTT, J., concur.